Our next case for this afternoon is 2020-30256, United States of America v. Sonny Scott. Ms. Rhodes, you may proceed. Thank you, Your Honor. May it please the Court, good afternoon, my name is Celia Rhodes with the Federal Public Defender's Office, and I represent Mr. Scott. This case involves an ineffective assistance of counsel claim based on counsel's failure to file a suppression motion that would have resulted in the exclusion of all of the evidence against Mr. Scott. The district court hinged denial of that claim on Churchill's first deficient performance, which asked whether counsel's representation was objectively reasonable under prevailing professional norms. And to meet that standard, a decision not to file a suppression motion must be strategic, conscious, and informed. It wasn't in this case for two independent reasons. First, counsel didn't understand the relevant facts for law necessary to make an informed decision. And under this Court's case law and Supreme Court case law, an uninformed decision is not sound and strategic. Second, even if counsel's decision had been informed, it was not objectively sound strategy. It was legally and logically incoherent. Now as to the first issue, the government doesn't seem to deny that counsel's decision rested on foundational mistakes of fact and law. But those mistakes are fatal because counsel's decision by definition cannot qualify as strategic, conscious, and informed because it was built on a rotten foundation. Under Cabot, a lawyer who's not familiar with the facts and law relevant to a client's case cannot meet the minimum level of competence required under the Sixth Amendment. And that's important because although courts generally will defer to counsel's tactical decision making, courts don't defer to decisions that are based on faulty information, rightfully so, because it's impossible to make a strategic choice under those circumstances. Now the most obvious factual mistake that counsel made was that she clearly misread the information in that critical DEA report, which provided the entire basis for the search of Mr. Scott. And a good example of that is on record page 689. As the record reflects, agents were at the same hotel parking lot as Mr. Scott on the night of the stop because they were attempting to surveil a drug suspect and his black SUV that was parked in the same parking lot. Counsel claimed she didn't challenge the stop because agents observed Mr. Scott transacting with their target. And after that interaction, the suspect got into the black SUV and left. That was absolutely wrong. Mr. Scott never interacted with anyone related to the drug operation or anyone even known to the DEA. And the report made that clear. And so did Mr. Scott. He told her that. So her decision was uninformed. It was based on faulty information. And that's fatal because under this court's case law and every other court's case law, Mr. Scott was entitled at the very least to an attorney who was apprised of the relevant facts of his case. It sounds that you're telling us very eloquently that why the council didn't understand the relevant facts. But what do we do with the fact that the district court made a specific conclusion that Ms. Yazbek's representation was not deficient? Are we reviewing that on a fresh record de novo? Like it sounds like you wish us to do? Or are we reviewing that under United States versus Puckett or some other standard of abuse of discretion? So how do we you? You just pointed it out to us fresh like it's de novo. But I'm I'm a little bit confused on this. Could you help? So I believe that the government might have been mistaken when they stated the standard of review in their briefing. The abuse of discretion standard applies, especially in the 2255 context, as opposed to 2254, to whether to grant an evidentiary hearing, which was granted in this case. Under a 2255 standard where there's no deference to a state court. This court's review of ineffective assistance of counsels to Strickland findings is a question of mixed law. In fact, so to know if there are individual factual findings, which I think there's actually very few at issue in this case. Those are clear error. But the legal issues always will be to know, though, because we're in the 2255 context and we're not talking about. So so that's why we're saying that the entirety, the totality of the circumstances doesn't support a Terry stop at all. And that that would have been that would have carried the day. Oh, absolutely. I think that the face of the DEA report just reading, Terry, I don't even think that you need to read any other case. There's obviously not reasonable suspicion under Terry. And there's extensive discussion of this issue in the record below 232 and 542, as well as 488. Agents simply believed that criminal activity was a drug act, a drug transaction. And that's what the DEA report says. It says they believed that a drug transaction occurred. But they didn't provide particular a particularized basis for that belief. That was defendant and situation specific as the law plainly requires. This is just elementary Fourth Amendment concepts. So like the Seventh Circuit said in Gentry, the fundamental principles of the Fourth Amendment law to the situation should have been apparent to counsel. And just application of that fundamental law here would have led to the obvious conclusion that the face of the DEA report obviously did not support reasonable suspicion. Because in this case, they only knew that Mr. Scott was in what they said was a high crime area in the same parking lot as a car, not even the drug suspect, but as the car of a drug suspect's car. And that he interacted with someone who the agents knew nothing about. It wasn't the suspect, contrary to what counsel believed. So certainly, to the extent, Your Honor, they are— What about like a good faith exclusion application like in Ramirez-Lujan? So under—do you mean because the belief was in good faith? Yes. So under Terry, good faith belief that criminal activity is occurring is not enough. There needs to be particularized, not only situation-specific, but defendant-specific information. And I actually—I think that's a good question because I actually think that that is the legal deficiency that counsel based her decision on. I counted at least four obvious mistakes related to Terry that counsel relied on. So first, her affidavit stated that she believed probable cause had been established by the information provided in the DEA report, which is plainly incorrect and also not the standard under Terry. But second, to your point, she stated at least twice, and this was actually the theme running throughout her testimony, that it didn't matter what agents actually saw. That it only mattered if they simply believed that a hand-to-hand transaction had occurred. And she said this at page 724 and 709. But again, this was the theme that ran throughout. That is the exact opposite of what Terry says. Terry says that good faith belief is not enough. So in Terry, it wouldn't have been enough for the officer to say, I believe that a stick-up is happening. The reason why Terry—the facts of Terry were sufficient was that the officer provided defendant-specific particularized facts to support that belief. So he said that if the two men were pacing back and forth, they were looking into the window repeatedly, he didn't just say, I believed that a stick-up was occurring. She also testified that agents could search Mr. Scott if they simply believed that a felony probably was committed, regardless of whether he was dangerous. And she also stated that once officers found contraband on this person, they were legitimized in that search. That is also plainly incorrect. These are misunderstandings of the most elementary Fourth Amendment concepts. And because her decision was based on those unreasonable mistakes, this wasn't a conscious and informed strategy. That is a threshold determination, which is what Hinton stands for, this court's case law, in Cabot, in Profitt. There has to have been a conscious and informed strategy. Only then do we even ask whether it was objectively reasonable. Ms. Roach, is there any evidence in the record to support your assertion that there is a reasonable probability that Scott would not have pleaded guilty to the possession charge, but for Ms. Yazbeck's failure to file the motion to suppress? Yes, so the district court made that initial finding in its first order and reasons, which I can find that record site. But Mr. Scott specifically alleged, first of all, that his plea was unknowing and voluntary because of this, which comports with this court's case law, and also that he would not have pleaded guilty but for counsel's advice. And I can find record citations. So your briefing focuses, and I understand it completely, it focuses chiefly on the performance prong of Strickland. And I didn't know if there was anything else today you wanted to add on the prejudice prong. Yes, so the prejudice prong, the reason why this can be brought in the 2255 context is because, especially in the case of a plea, is that the plea is rendered unknowing and involuntary, which is why, as a threshold matter, defendants have to allege that they wouldn't have pled guilty otherwise. Now, the evidentiary hearing, once the district court found that had been established, was limited only to the trial counsel's testimony. So that was specifically limited to her. To the extent that this court believes that there needs to be more factual support for that allegation, which Mr. Scott himself provided and the district court accepted as true, then a remand would be required. So we'd be permitted to put that evidence in the record as required from doing. As for the prejudice prong, I do think that this court can affirm that determination on the current record. There's extensive analysis on this issue below, as I noted, and also just the face of the DEA report shows that any competent counsel should have known that this was facially insufficient under Terry. Now, to the extent this court disagrees, again, a remand, not affirmance, is required. There's no path to affirmance on this record because Mr. Scott was specifically prevented at the government's urging. So government-invited error. Mr. Scott was prevented from providing any information beyond what counsel knew and believed at the time. So the district court specifically limited any additional information on prejudice and said, I'm just going to decide this based on the government's offer. I'm not going to allow any other information on this point. Quick question, which may honestly be better for Mr. Daly, but I'll give you a chance. So I'm just sort of confused on the chronology and how things sort of unfolded on that night. So agents were surveilling the parking lot. Saw Scott in the parking lot, later arrested him at the Taco Bell. What was the amount of time between those two encounters? So I don't think the DEA report actually says the amount of time, if I'm recalling correctly. The agents established surveillance at 1030. They then see, the government says that the black SUV arrived, but that's not what the DEA report says. They see, they find the SUV in the parking lot. They then claim that Mr. Scott is interacting with another individual, provide no information, say that they believe that that's a hand-to-hand transaction. They then say that a person who turns out to be their suspect gets into the black SUV and leaves. And a short time later, Mr. Scott leaves the parking lot as well. They didn't follow him after he left the hotel parking lot? They just coincidentally ran into him at a different location at the Taco Bell? It was totally different agents. And we have no information. It just says shortly after leaving the parking lot of the stay in the Express and Suite, Special Agent Crow and Special Agent Ulmer were different agents. Observe Scott in the drive-thru of the Taco Bell parking lot. Agents were set up at a Walmart nearby. And the person actually left to go to the Walmart because there was a controlled buy. They were meeting their confidential informant. Agents were apparently saw him, saw Mr. Scott at the drive-thru on his motorcycle. We have no idea why they decided to stop him. The DEA report suggests that does not say that some sort of information was transmitted to those agents. In addition to the DEA report, do you know what materials Mr. Yazbek received from the government before Scott pleaded guilty? It was only 31 pages. That was the sole production. In addition to that report, there were just a lot of it was just photographs. Honestly, it would have taken probably five minutes to read in total. So it was photographs of the Jack Lanks container, which is the Cherokee container that they removed from his person inside. That's where drugs were found. And then the photograph of the gun and then also his criminal history. Did she request any materials in addition to those provided by the government? No. And in fact, the DEA reported, as you might see in the record, that's 213 is heavily redacted. And she didn't even request the unredacted version. Did she conduct any interviews or meet with any of those DEA agents? No, absolutely not. Didn't conduct any interviews with anyone. Did nothing. So she received this 31 page production. And then less than two weeks later, about a week and a half, notified the district court that he would be pleaded guilty. Did she conduct any investigation of any measure about the events of that night? None. Not not an ounce of investigation. Even after her client said there has been there has there was no hand in transaction. This is incorrect. Even after the face of the DEA report made clear that the DEA did not have reasonable suspicion based on the information provided. She didn't seek out. She didn't go to the seat. She did not do literally nothing. She received the production, told her client he should plead guilty because he had no chance on the suppression issue. Tried to get him to cooperate. That fell apart. At that point, they're still in the pretrial posture. So she could have still at that point filed a motion to suppress when it was clear that cooperation wasn't going to benefit him. But nonetheless, went forward with this plea, developing a factual basis that has him admit to all of the facts relevant to drug possession. So she not only spent a week and a half with his case and had him plead guilty. She had him swear under oath without a plea agreement to facts that created further criminal liability. So she not only didn't help him in this case, she made his situation actively worse. And I see my time. OK, Mr. Daly, please, the court. Good afternoon. Kyle Daly for the United States. The district court in this case conducted an evidentiary hearing. Listen to the testimony of Scott's attorney, found her credible and determined she reasonably decided not to file a motion to suppress. At the time that Ms. Yazbek made that decision, she knew that her client had a serious criminal record. He was arrested not only with the gun, but with baggies of heroin and cocaine and two hundred fifty dollars in cash. She testified that she was familiar with the law regarding Terry stops and she was trained on Terry as a CGA panel attorney. She had been filing motions to suppress and conducting hearings on motions to suppress for 10 years at that time. She reviewed the DA six in this case. She considered she testified that she considered the totality of the circumstances observed by the agents, including Scott's proximity and time to the dealer, the area and the suspected drug transaction. She said that she did legal research on the issue and that she concluded the motion to suppress was unlikely to succeed. She was concerned and afraid that filing a motion to suppress could result in the piling on of additional facts that would cause the district court to believe that Scott was a drug dealer and not just a user. She was concerned because based on her past experience in other cases, officers had testified the facts not just in the report, but outside the report as well. And those facts were usually not helpful to her client. She was also concerned that the government might bring additional drug related charges down the line. She advised Scott that the motion to suppress was likely going to fail and that it was better to try and cooperate with the government and plead guilty. And Scott accepted that advice. Ms. Yazbek reasonably believed that reasonable suspicion would be established at a hearing and motion to suppress would be denied. In this case, the agents knew that heroin was being sold at this specific hotel. They'd frequently observed transactions in public lots in the area. The incident occurred after 10 o'clock at night. It was in a parking lot behind the hotel. The heroin dealer arrived at 1015, and Scott arrived 15 minutes later at 1030. He met with somebody in the parking lot for a short amount of time, and he was there for only 15 minutes before leaving immediately after the drug dealer left. The agents, based on these observations and their experience, reasonably suspected that a drug transaction had occurred. There was no showing here that any further investigation by Ms. Yazbek would have unearthed anything that would have been helpful or changed the landscape for this motion to suppress. There was no reason for Ms. Yazbek to believe that the DE agents would participate in an interview and give her the preview of the facts that they were going to testify to at the evidentiary hearing if she filed the motion to suppress. There were no other witnesses to interview other than Scott because Scott claimed that he didn't know anybody at the hotel. And despite filing multiple memos on the ineffective assistance claim and retaining an investigator a month before the 2255 hearing, Scott has not been able to articulate a single item of evidence that he has uncovered that would have changed the landscape on the motion to suppress and made it unreasonable for Ms. Yazbek to forego filing that motion in light of the concerns as to what might happen to her client if she pushed the case. Mr. Daly, Mr. Daly, could you please tell us what standard of review governs our review of this case? So the credibility of the testimony is clear air. There was only one witness who testified here, so clear air on the facts. De novo for conclusions of law reached by the court. So overall, it's an abuse of discretion standard. What? That's not the same thing. Those are two different standards. Yes, Your Honor. Conclusions of law, de novo, conclusions of fact, clear air. Right. That's the standard. OK. Thank you, Your Honor. Ms. Yazbek's actions leading up to the plea and its sentencing show that her decision was strategic and that the reasons that she gave at the hearing were indeed the reasons that she was concerned about finding the motion to suppress. She testified that including the drug transaction in the factual basis might verify in the district court's mind that Scott was a drug dealer. So she spoke to the AUSA. She convinced the AUSA to remove any mention of that drug transaction from the factual basis. And the AUSA did so. And she also successfully objected to its inclusion in the PSR, which avoided a four-level increase in her client's offense level that the district court was considering. It's undisputed that there was no actual hand-to-hand transaction that was observed by the DEA agents, right? That's right. That's right. Their view was partly. Yeah, there was no hand-to-hand that would support this. And so what is the support for the reasonable suspicion? The fact that it's a brief meeting in the back of a hotel. So they do observe a meeting of some kind. They don't know exactly what's happened, but it's in close proximity and time and space to this drug dealer arriving and leaving. So the officers only need a minimal level of suspicion just to stop somebody and confirm or dispel their suspicions regarding whether or not a transaction has occurred. And based on all the information that they know about this hotel and what's going on with the drug dealer at the time, the report is not clear as to whether or not who the individual is that Scott meets with. You can see that Ms. Yazbek made a number of incorrect statements about how the Fourth Amendment works in her testimony. She made a comment that could have been interpreted by the district court, but apparently was not, that the fruits of a stop could justify the reasonable suspicion for the stop. But when you look at her testimony as a whole, because she was asked questions about this multiple times by both parties and the court, the district court was within its discretion to find that she understood the law and Terry stopped. She understood that it was the facts that the agents observed that leads to whether or not a reasonable suspicion has been established. And certainly her testimony did not establish that any misunderstanding of Terry caused her not to file the motion to suppress or would have changed her decision. And she was wrong factually about a lot of things about whether they were in the report or not, wasn't she? She was testifying about what she expected to hear at the evidentiary hearing. Because this report is vague, the officers were going to have to fix these ambiguities at the hearing one way or another. Now, it could have gone against her, it could have gone for her, and she was afraid it would go against her based on her past experience. But I wouldn't say that her testimony, that she was wrong about the facts. She was expecting the agents to testify a certain way based on the lack of clarity in that report and her prior experience. In sum, there are countless ways to provide effective assistance of counsel in any given case. And counsel's performance is evaluated based upon the time of the alleged error. Excuse me, sir. Can you provide effective assistance if you do not vet or even make a cursory effort to look into the applicable facts when your client is telling you that the facts are different? It depends on what there is to look into. So you can do no work whatsoever and still be effective? You have to at least read the discovery that's given to you, talk to your client. And then if there are leads in that discovery or information from your client that you can be expected to track down, then you need to do that. But in this case, there was nothing to track down. And the fact that even today, the defense hasn't been able to tell us of anything that they've tracked down that would help Scott in the motion to suppress shows that there was nothing for her to, no roads for her to go down. There's certainly no case law that indicates that an attorney is ineffective for failing to... Say there are no roads to go down, but if the client says, it did not happen this way. This is flatly, emphatically untrue. Is that not, I used the word lead earlier. I don't know if that's a lead in the dictionary sense, but it's certainly a road to travel down, it seems to me. There's nothing for her to do with that information that anybody has been able to establish here. I mean, yes, she can call her client during the motion hearing and have him testify to that. But if there's no evidence that would corroborate that, then there's nothing for her to look into. She's got to look for the evidence. She's got to conduct, she's got to lift a finger, doesn't she? She has to kind of take it upon herself to conduct something resembling an investigation. If her client says, it didn't happen this way. Here's what happened. Doesn't she have some professional duty to try to get to the bottom of it? Only if there's something specific for her to do, your honor. I can think of something specific. She could go to the scene and bring a friend and demonstrate that the view was obstructed where the officers were and that they couldn't have seen the hand-to-hand transaction. In that week and a half, she could have done that one thing, which doesn't require a lot of money or research or an expert. Maybe you'd bring an expert to say about visibility, but I don't know that you would need that. I mean, isn't that a basic thing? If someone's saying, I saw someone do a hand-to-hand or it's unclear whether they did, to establish that, no, you could not have seen that. If she knows where the officers were viewing her client from. Well, shouldn't she figure that out? She should interview the people and figure it out and get it from the report and ask for supplemental information. That's all something she should learn at the scene of the crime, the alleged crime. When the attorney is stuck with the words of the police officers, if these were civilian witnesses that she could interview and we'd have reason to believe. Why couldn't she meet with and interview the DEA agents? Well, any attorney could try. But as the Seventh Circuit found in rule in the case that we cited, there's just no there's no reasonable expectation that these law enforcement officers are going to participate in an interview. Would it have been unreasonable of her to try? No. But but a reasonably competent attorney doesn't have to expect that they're going to participate in that interview. When I asked Miss Rhodes whether the lawyer conducted any investigation, any investigation about the events of that night, Miss Rhodes said no, nothing. You don't contest that, do you? We do contest it to the extent of, well, it depends on what you mean by an investigation. If an investigation means hire an investigator and ask that investigator to go do something in particular, she did not do that. The investigation that she conducted was talking to her client and reading the discovery, which, for instance, in Kimmelman was what the Louisiana Supreme Court or the United States Supreme Court said. The discovery, the 31 pages, I think it was that was handed to her. She didn't request anything beyond that. Is that right? No. And there's no indication that there was anything else to be provided to her. But as far as you know, she did not undertake any effort to look further into the facts of this alleged or this hand to hand drug transaction that the agents believed that they observed. No, as far as we know, there was she did not do anything else because she didn't feel that there was anything else to have been done. And that was what the district court found was that her decision not to investigate further was reasonable in light of all the facts that she knew at the time. And I have a further question about the strategic reasons. To me, it's counterintuitive that I'm not going to do anything that might benefit my client because I want to put my client in the best position. It would be my understanding that I would at least threaten or not threaten in a negative way, but at least suggest that I might bring a motion to suppress in order to negotiate with the with the prosecutor that I would say, I'm going to do this and that and the other. And what do you can you give me if I don't do that? Not say I'm just going to try to be nice and maybe they'll give me something. So I think you would negotiate from a position of strength rather than a position of begging for something. So I'm very this idea that, oh, I'm afraid that they might bring up other things if I don't plead. Well, in fact, they did bring up other things during the plea, and she could have tried to negotiate so that those wouldn't come up. You know, they could have structured something that she wouldn't be subject to some other further charges or she's going to have those dismissed or I mean for the for her client, Mr. Scott. I don't understand how this was strategically beneficial. All that. Yes, Your Honor, all the actions that you've described would be reasonable, but there's countless ways to provide reasonable effective representation. And one of them is to if you're if you have a legitimate concern based on the strength of the case against your client factually at trial, that things could get worse for your client that when you have other facts of other crimes like drugs being found on him and a suspected drug transaction. If you have a reasonable concern that things could get worse, rather than than fighting with the government and trying to push the government, you can be cooperative and you and you can advise your client to to try and go for a five day which is what was done here. So, there wasn't much cooperation I mean there wasn't like anything between I'm you know she I didn't see an acknowledgement we're going to really be good, and we need you to help us out here, and it wasn't a good cop kind of version of it either. It was a nothing version of it. Well, she talked to the client about the meeting before the meeting, and there seemed that there was an expectation that he was going to cooperate and then he backed off on. So now so then she was just left with having attempted to cooperate with the government and and not much else. And in light of the, the facts and the DA six and what you reasonably expected would be testified to her decision not to threaten that motion or file it was reasonable. She could have taken a different tactic but the tactic that she took was was nevertheless reasonable. Ultimately, Scott has not shown that Missy has the next decision was unreasonable and much less so unreasonable that you fail to function as the council guaranteed by the Sixth Amendment. If there are no further questions, we ask that you affirm the district court. Thanks very much. Council. Can you win on prejudice, without us going back, if you were to lose on the other prong. No, Your Honor, if this court. The reason is because we would presume that this court would not find deficient performance unless it was such a clear the motion was such a clear winner that no reasonably competent attorney could could choose not to file it. So, if you, if you find that this motion was a clear winner and that had to have been filed, then it was, then you're going to find it was a clear winner for the prejudice prong as well. And we acknowledge that there's no reasonable probability that Scott would have pled guilty. Had this firearm been suppressed since it was the only evidence against your view send it back at all. You just, we should just render. That's, that's our position, Your Honor. Okay, so I get it straight your view is that if, if Scott satisfies Scott kind of scales that performance prong that he necessarily scales the prejudice prong. In this case where, where the only evidence against him is the gun and the government cannot proceed to trial without it, then yes and under, under the unique circumstances of this case, yes that's our position. Thank you, Your Honors. You may proceed. Thank you, Your Honor. There's a couple of quick factual errors that I'd like to correct. First of all, the DEA report. I think, like, counsel, the government is inserting a couple of facts in the deer report that aren't there. So, one, it doesn't say anything about heroin deals. It says only that this was believed to be a high crime area by agents and that they knew that this particular suspect, the one they were surveilling had been known to conduct transactions there. As far as I can tell, it says nothing about heroin. The heroin came out after the fact, which of course can't be used to legitimize the stop. It also doesn't say that the suspect arrived close in time to Mr. Scott, it only says that they found the car in the parking lot. It also does not say that this was a brief meeting. There is absolutely no information describing what that interaction was. None. So this is exactly like Terry, two people standing on a corner interacting is not suspicious. I also want to correct. This was not a single comment that showed a misunderstanding of Terry. This was pervasive throughout her testimony. So it wasn't just that she said the stop was legitimized by the later finding. She expressly stated that because the officers believed that in a drug transaction had occurred, that that was enough. And that's what she thought they would testify to. And so she would have lost the suppression motion. She also expressly stated that not just that she believed that's how they would testify, but that's what the D.A. report said. She stated that she didn't file because it was enough that they believed a transaction had occurred. And she also said she didn't file because they had observed him meeting with the suspect. She didn't just say that's how they should testify. But if she had, that's an assumption. And you can't base your determination on a pure speculation about agents will say that they're going to somehow insert new facts that are going to make your suppression motion harder. And Ramona's and homes back, which we cite in our briefing shows that to your point, I think that there's two issues about failing to investigate. So one goes to reasonableness. You cannot render a reasonable, conscious decision if it is completely uninformed. It's not possible. So that's deficiency. And that the cases like Hinton say that cases like Wiggins, that it's just not possible. We don't even get to the strategic part. It also goes to this failure to investigate, which Mr. Scott alleged in his petition. The district court found that he had alleged it. But due to government invited error, serious error in the proceedings below, we were barred from presenting that evidence. So it's surprising to me that the government continues to say that we failed to put this information in the record when they affirmatively prevented us from doing that in there. In our initial pre-hearing briefing, we stated specifically that we were going to present evidence of the circumstances of the stop and what a reasonable investigation would have shown. We said that a reasonable investigation would have shown that it was an illegal search. The government responded and misstated the scope of the inquiry, saying that the only information that was relevant to the claim was exactly what counsel knew at the time, which is plainly incorrect under decades of case law. Then at the status conferences, which are also described in record at 503, 569 to 70, the government said he did not raise a failure to investigate claim. He didn't allege that. That was patently incorrect. As the district court ultimately found, said, OK, this was actually properly before the court. We said we have an investigator. We actually did go to the scene. And Judge Elrod, to your point, what we would have shown at the hearing was that agents could not have seen this transaction. We were able to corroborate Mr. Scott's claim. And that's what our investigator was sitting in the hallway ready to present. But for the government's invited error. Now, I don't think this court needs to reach that because I think that the current record plainly establishes that counsel's representation was deficient. So. Like I said, I don't think there's any path to affirmance in this case, but I think there's a clear path to reversal. Counsel's performance was patently deficient. She did not understand the facts and the law. She made no effort to understand that she needed no investigation. She spent a week and a half with the discovery. I mean, that's stunning. That undermines our entire adversarial process. Mr. Scott essentially did not have counsel. Mr. Scott's only counsel was Sonny Scott. He's the one who asked for the information about the hand to hand transaction to be removed from the factual basis. Not counsel. That's what she explicitly testified to. He's the one who requested that. And the reason he requested it be removed is because it wasn't untrue. As he told his counsel over and over again. So we would ask this court to reverse the district court's finding and order that Mr. Scott's conviction be vacated. But at the very least, a remand is required because of the serious invited error by the government. I see my tax. Thank you. Thank you. We have your argument. We appreciate both arguments today. And this case is submitted. This concludes today's arguments virtually that we had in the court. And we will reconvene tomorrow afternoon to hear additional arguments for this sitting of the court. Thank you. Thank you.